# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 14, 2009 Session

## STATE OF TENNESSEE v. MICHAEL VINCENT RICCO

### Direct Appeal from the Circuit Court for Henderson County
No. 07013-2    Donald Allen, Judge

### No. W2008-00756-CCA-R3-CD  - Filed July 23, 2009

The defendant was convicted by jury of rape of a child and aggravated sexual battery.  He was subsequently sentenced to 18 years for rape of a child and 10 years for aggravated sexual battery. His sentences were ordered to run consecutively for a total effective sentence of 28 years.  On appeal, the defendant presents the following issues for review: (1) whether the evidence was sufficient to sustain his convictions, and (2) whether the trial court erred in ordering the defendant to serve his sentences consecutively rather than concurrently.  Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Hewitt Chatman, Assistant Public Defender, Jackson, Tennessee, for the appellant, Michael Vincent Ricco.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Jerry Woodall, District Attorney General; and Bill R. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### BACKGROUND

The defendant was charged with six counts of rape of a child.  The following relevant evidence was presented at the defendant's trial.  K.T.,[1] the minor victim in this case, testified that she spent the night with her grandmother on several occasions.  Sometimes, the defendant, who was

---

[1] It is the policy of this court to refer to minor victims of sexual crimes by their initials.

her grandmother's boyfriend, came over and spent the night. When the defendant spent the night, K.T., the defendant, and her grandmother would sleep together in the only bed in her grandmother's apartment. K.T. recalled that one night, while in the bed, the defendant put his hands "behind my panties" and placed his finger "in my butt." Her grandmother awoke from sleep, saw what was happening and told the defendant to stop. K.T. said that at a different time she and her grandmother stayed at the defendant's house. While her grandmother was taking a shower, the defendant stuck his private part in her private part and in her mouth. K.T. said that the defendant ejaculated both times. K.T. remembered that she was in the defendant's daughter's room when the incident happened. K.T. also indicated that she was sexually abused on several successive days while she and her grandmother were staying at the defendant's house. She was unable to remember, however, whether she stayed at the defendant's house one night or more than one night.

On cross-examination, K.T. stated that she did not know how to count on a clock or tell time, but she thought her grandmother stayed in the shower one or two hours. She also said that the defendant had handcuffed her to his daughter's bed and taped her mouth with tape. She indicated that she yelled and her grandmother walked in from the shower and saw the sexual assault in progress. She further indicated that she and her grandmother stayed at the defendant's house for seven straight days. She also said that she was getting confused. On re-direct examination, K.T. said that all her grandmother saw was the incident when the defendant had his hands in her panties. K.T. remembered that while she was at the defendant's house she heard fireworks and suggested that the incident occurred after July 4th because the people were setting off "leftover fireworks" before school started. She also indicated that she did not know how long one hour or two hours was. On re-cross examination, K.T. said that she thought she and her grandmother visited the defendant in the fall. She said she thought that April was in the fall. However, she later said it was hot outside and sunny and she did not know what month she went over to the defendant's house.

Lisa Piercey testified that she was a physician practicing pediatric medicine and also the medical director of the Madison County Child Advocacy Center. Dr. Piercey recalled that on September 25, 2006, she conducted a physical examination of K.T. The physical examination was performed as a result of allegations of sexual abuse. As part of her examination, Dr. Piercey explained that she took K.T.'s history wherein she was told by K.T. and K.T.'s mother that K.T. had been sexually abused by the defendant. Dr. Piercey stated that her physical examination revealed that K.T. had an "abnormal hymen." Dr. Piercey described the hymen "like the base of a clock, and anything that is . . . below the 3:00 and 9:00 positions is considered abnormal meaning you're probably not born that way." Dr. Piercey testified that K.T. "had a complete absence of the hymen from the 3:00 to 5:00 position. At the 7:00 position she had a very deep notch which means the hymen was transected almost to the base." Dr. Piercey said that the abnormal and incomplete state of K.T's hymen signified "clear evidence of vaginal penetration." Dr. Piercey stated that based on her examination she concluded that K.T. had been sexually abused. Dr. Piercey noted that K.T. was five-years-old at the time of the physical examination. Dr. Piercey acknowledged that she was unable to determine when the penetration occurred. Dr. Piercey also acknowledged that K.T's injury looked like healed trauma, and therefore, there was no way to date the injury. Dr. Piercey said that

it was highly unlikely that a prepubescent girl would cause injury to her own hymen because "the hymen is extremely sensitive and painful tissue."

Anthony Woodfin testified that he was an investigator with the Henderson County Sheriff's Department. Investigator Woodfin recalled that he became involved in the investigation of the defendant in December of 2006. Investigator Woodfin noted that he obtained probable cause to arrest the defendant after he received information from a transcript of an interview with K.T. and Dr. Piercey's medical examination report. Investigator Woodfin testified that the information he received indicated that one incident of sexual abuse occurred at the grandmother's apartment, and other incidents occurred at the defendant's house. Investigator Woodfin said he talked to the defendant about the allegations of sexual abuse during his investigation and the defendant denied the allegations.

The following witnesses were called by the defense. Michelle Valdez testified that she worked for the Department of Children's Services (DCS). She recalled that a forensic interview of K.T. was conducted on August 14, 2006. Ms. Valdez said that, during the forensic interview, K.T. disclosed that the defendant touched her "kitty cat and her butt with his finger and his tongue."

Alita Tucker testified that in August she took her daughter, K.T., to the doctor for a routine physical examination in preparation for the upcoming school year. At this time, K.T. told the doctor that she had been molested. As a result of this revelation, DCS was notified and K.T. was referred to Dr. Lisa Piercey. Ms. Tucker acknowledged that K.T. would spend the weekend and some nights with her grandmother. She also noted that on occasion she would bring K.T. to her grandmother's when the defendant was present at the apartment. Ms. Tucker said that K.T. did not talk to her about "what happened" because her daughter does not open up to her. Ms. Tucker said she was aware of an incident involving K.T., who was four years old at the time, and an eight-year-old boy. She explained that about two years ago she walked in on the boy with K.T., but the children were fully clothed and there was no evidence that the boy had "messed with [K.T.]."

Cassandra Ricco, the ex-wife of the defendant, testified as to the layout of the defendant's house. She said that the house only had one bathroom. She noted that the defendant had a small camping trailer located east of his house. She said that the trailer served as the defendant's radio room where he had CB radios and a television. She acknowledged a picture of the defendant's daughter's bedroom which showed steps going up to the attic. She noted that there was a half-bed with no posts in the bedroom. She recalled that the defendant had purchased a cell phone battery from Walmart on April 9, 2006.

K.T.'s grandmother, Dawn Alexander, testified that she became acquainted with the defendant through her work. She started dating the defendant on March 6, 2006, though she knew him for a couple of years prior to dating. She recalled that her daughter and granddaughter were all living with her at the time in a trailer, but they moved out when she relocated to an apartment around the end of June. Ms. Alexander acknowledged that the defendant came to visit her occasionally at her apartment.

According to Ms. Alexander, the only time K.T. accompanied her to the defendant's house was one weekend in April of 2006. She recalled that during their visit, the defendant spent a lot of time in his camper trailer where he kept his C.B. radio. She also recalled that she saw K.T. in the spare bedroom watching TV and playing. She acknowledged that she took a shower during the visit. However, she said that she was in the shower for only fifteen minutes, and as far as she knew, the defendant was still in his camper trailer. Ms. Alexander also noted that the bathroom in the house was located next to the outside porch. She said that someone would have to cross the porch to get inside the house and she did not hear anyone cross the porch while she was in the bathroom. Ms. Alexander also testified that she did not hear K.T. scream or say anything while she was in the shower. Ms. Alexander said that she saw K.T. in the bedroom watching cartoons when she came out of the shower. She said that she did not see the defendant sexually assault K.T. at any time during the weekend visit. She insisted that the only direct contact the defendant made with K.T was when he walked up to her and kissed her on the top of her head. Ms. Alexander said that except for the 15 minutes she spent in the shower, the only other time K.T. could have been alone with the defendant was when she laid down on the couch Friday night, which was the night they arrived at the defendant's house. She said that she heard no noises while lying on the couch. Ms. Alexander also said that she, K.T., and the defendant went to the Walmart in Jackson to purchase a cell phone battery and case.

Ms. Alexander testified that one night while she was at her apartment, K.T. was dropped off by her mother. Ms. Alexander recalled that on this occasion the defendant spent the night. She recalled that they all went to sleep in her king-sized water bed. She slept in the middle of the bed with the defendant on one side of the bed and K.T. on the other. She said she was partially asleep but woke up when she felt movement on the bed. At this time, she saw the defendant with his hands down the back of K.T's underwear. She asked the defendant what he was doing and he told her that he might have dozed off and thought it was her. Ms. Alexander said that she saw the defendant remove his hand immediately from K.T.'s underwear. Ms. Alexander said that this was the only time she saw the defendant touching her granddaughter inappropriately. She emphasized that she would not have remained in a relationship with the defendant if she thought he was molesting her granddaughter. She denied walking into a room at the defendant's house and observing him molesting K.T.

Ms. Alexander testified that sometime around September 25th, she heard that charges were filed accusing the defendant of molesting her granddaughter. She and her daughter did not speak to each other for some time as she did not believe her granddaughter. Ms. Alexander said that she stayed in a relationship with the defendant up until the time he was arrested in December. She further asserted that she loved the defendant and that her daughter did not like the defendant.

On cross-examination, Ms. Alexander reiterated that the defendant did not have much contact with K.T. When asked, however, Ms. Alexander indicated that the weekend visit to the defendant's house occurred in "June of 2006." She also said that the incident that occurred at her apartment occurred after the weekend visit to the defendant's house. Ms. Alexander noted that the defendant's

excuse as to why he was inappropriately touching K.T's bottom did not make sense, but said that she did not think about his excuse until the next morning.

The defendant testified that he began dating K.T.'s grandmother, Dawn Alexander, in March of 2006. When they first started dating, Dawn lived in a trailer with her daughter and granddaughter. The defendant said that he did not get along with Alita Tucker, Dawn's daughter, as she would ask him for money every time he would visit Dawn. According to the defendant, after Dawn moved to her apartment, he would sometimes stay overnight. However, he only stayed overnight once while K.T. was present. He recalled that the overnight stay occurred in July or August of 2006.

The defendant testified that Dawn would stay at his place every other weekend or every third weekend. One weekend in April, Dawn brought K.T. with her to the defendant's house. The defendant recalled that during the weekend, all three of them went to Jackson, Tennessee to shop and pick up a few things. The defendant admitted that this weekend was the "only time I ever took Dawn and the granddaughter anywhere." The defendant recalled that he purchased a cell phone battery during the trip. The defendant said that during this weekend visit he spent a considerable amount of time in his camper trailer working with his radio equipment. He said that Dawn and K.T. stayed Saturday and Sunday but only spent one night at his place during the weekend visit. The defendant said that he could not remember when Dawn took a shower because he spent a lot of time in the camper trailer.

The defendant said he owned a pair of handcuffs, but they were kept hidden in his bedroom and K.T. never saw them. The defendant described the bed in the extra bedroom as a half-bed with box springs and a mattress. The defendant said that the bed had no posts where an individual could attach handcuffs. The defendant asserted that he made no sexual advances towards K.T. whatsoever.

On cross-examination, the defendant denied any sexual intent or wrongdoing on his part regarding the incident where his hand went inside K.T.'s panties. The defendant explained that he fell asleep watching TV in the bedroom. He was positioned between Dawn and K.T. on the bed. He was awakened by Dawn, and K.T. "was on this side of me and I just had my hand just being supported by the elastic." The defendant asserted that his hand placement "was an accident." The defendant reiterated that Dawn and K.T. only spent Saturday night at his house during the weekend visit.

K.T. was recalled to testify as a rebuttal witness. She testified that while she was at the defendant's house he did something to her while her grandmother was in the shower. Something else happened to her while her grandmother was in the bed in another room.

At the conclusion of the trial, the jury found the defendant guilty of rape of a child as charged in count one; not guilty on counts two and three, and guilty of aggravated sexual battery as a lesser-included offense in count four. The jury was unable to reach a unanimous verdict as to counts five and six, and therefore, the trial judge declared a mistrial on those counts. The defendant was subsequently ordered to serve consecutive sentences of 18 years for the rape of a child conviction,

and 10 years for the aggravated sexual battery conviction for a total effective sentence of 28 years incarceration.

## ANALYSIS
### I. Sufficiency of the Evidence

On appeal, the defendant first challenges the sufficiency of the evidence, arguing that there was no proof presented at trial to support his convictions. In making his argument, the defendant asserts that there was no proof presented at trial that K.T. visited his home during the "July through August" time frame alleged in the indictment. He points to inconsistencies in K.T's testimony and asserts that it is clear from all the evidence "that he had neither the opportunity, time nor the means to commit the offenses for which he was convicted."

We begin our review by setting forth the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id*. § 39-13-501(7).

Aggravated sexual battery is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: [t]he victim is less than thirteen (13) years of age." *Id*. § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching

-6-

can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. § 39-13-501(6). Additionally, " '[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id*. at (2).

After considering the evidence in the light most favorable to the state, we conclude that a rational trier of fact could have found the defendant guilty of the rape of a child and aggravated sexual battery. At trial, K.T. testified that she spent the night with her grandmother, Dawn Alexander, and the defendant. They all slept together in the only bed in her grandmother's apartment. On this particular occasion, while in bed, the defendant put his hands in K.T.'s panties and touched her buttocks. K.T.'s grandmother, Dawn Alexander, corroborated K.T.'s testimony by stating that she awoke to find the defendant's hand in K.T's panties. K.T. further testified that she and her grandmother stayed at the defendant's house. While her grandmother was taking a shower, the defendant stuck his private part in her private part and in her mouth. K.T. said that the defendant ejaculated both times. K.T. remembered that she was in the defendant's daughter's room when the incident happened. She also indicated that this incident occurred after July 4th but before school started. K.T's testimony was corroborated by Dr. Piercey's testimony who found evidence of vaginal penetration. Here, the defendant's sufficiency argument essentially amounts to a challenge to the jury's credibility determinations. As previously noted, the weight and credibility of a witness's testimony and the reconciliation of conflicts in the testimony are matters entrusted exclusively to the trier of fact. In the instant case, the jury, as was their prerogative, resolved the conflicting testimony in favor of the state and found that the evidence presented at trial supported convictions for the rape of a child and aggravated sexual battery. Because the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt, we affirm the judgments.

## II. Consecutive Sentencing

The defendant next challenges the trial court's decision to order consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5). Specifically, the defendant submits that there is a lack of definitive proof regarding the victim's physical and mental damage, the time span of the undetected sexual activity, the relationship between the defendant and the victim, and the nature and scope of the sexual acts beyond that inherent in the offenses for which he was convicted. The defendant further submits that his aggregate sentence does not reasonably relate to the severity of the offenses for which he was convicted.

When a defendant challenges the length and manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then a review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentencing

decision was improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if: (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210.

In the instant case, the trial court ordered the sentences to run consecutively under Tennessee Code Annotated section 40-35-115(b)(5). That statute allows consecutive sentencing if the court finds, by a preponderance of the evidence, the following:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

In ordering consecutive sentencing, the trial court found:

> The Court is considering the aggravated circumstances that arose from this relationship. Now, this was a situation where this young child, five year old child, had been entrusted with her grandmother which happened to be the girlfriend of Mr. Ricco and during the time that the child was entrusted with the grandmother, Mr. Ricco took advantage of her. I believe the proof was pretty obvious on one occasion it happened at the grandmother's house and at least on another occasion, if not more, there were incidences of rape of this child at Mr. Ricco's residence. The Court does take that into consideration.
>
> Also, the Court takes into consideration the time span under which this sexual activity occurred. You know, this was over at least a two month period of time between July and August of 2006. . . . Again, according to the proof there were multiple occasions of these incidents taking place.
>
> Also, the Court takes into consideration the nature and scope of these sexual acts. You know, there was plenty of evidence in this case to indicate medical, scientific, physical evidence that would indicate that this young five year old child suffered from vaginal penetration, anal penetration and also oral penetration. Again, there was plenty of testimony from the child and from the doctor and from statements made by the child that this young child was penetrated by the defendant's finger, by his penis and also by his tongue. It wasn't clear from the proof on which particular occasions which type of penetration took place and I really suspect that [this unknown] was part of the reason the jury had some difficulty trying to determine to what extent this penetration took place. I mean, there was ample proof of multiple counts of rape of this child in multiple ways . . . . [T]he jury came back and found him guilty on two counts and I suspect the reason being that it was pretty clear that

at least on one occasion it happened at the grandmother's house and on another occasion it happened at Mr. Ricco's house. . . .

But based upon the extent of the physical damage to the victim and the mental damage to the victim – I recall listening to the doctor about how painful this had to be to this five year old child. The child didn't really relate to a great extent the pain that she suffered but obviously from what the doctor said, this would have been a very painful experience for the child.

Based upon all of that, the Court finds that it would be appropriate to run these two sentences consecutive . . . . So this 10 year sentence is consecutive to the 18 year sentence. Mr. Ricco will serve a 28 year sentence . . . .

While not substantial, it is our view that the evidence in the record was sufficient to justify consecutive sentencing under section 40-35-115(b)(5). According to the victim's recollection, she was sexually abused on multiple occasions by the defendant during the summer months of 2006. Dr. Piercey testified that her examination of the victim showed healed trauma to her vagina. Dr. Piercey's testimony also suggested that trauma to a prepubescent girl's hymen would be painful as the area is extremely sensitive. The record also reflects a statement from the victim's representative. The statement indicates that the victim, age five, was unable to verbalize her feelings regarding the abuse because of her age. However, the victim was acting aggressively towards other children, had nightmares, and urinated in the bed at night. The record also shows that the defendant was the boyfriend of the victim's grandmother. Although the defendant was not the victim's caretaker, the defendant was able to commit the offenses for which he was convicted because of his relationship with the victim's grandmother. Accordingly, we perceive no error in the court's sentencing under section 40-35-115(b)(5) as the court's findings appear to be adequately supported by the record. The court's order of consecutive sentencing is affirmed.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
J.C. McLIN, JUDGE